**UNITED PARCEL SERVICE
COMPANY, Appellant,**

**v.**

**STATE of Alaska, DEPARTMENT
OF REVENUE, Appellee.**

**No. S–8561.**

Supreme Court of Alaska.

April 7, 2000.

Richard D. Birns and Madeleine Sann, Philadelphia, Pennsylvania, and Joseph R.D. Loescher, Hughes Thorsness Powell Huddleston & Bauman LLC, Anchorage, for Appellant.

Stephen C. Slotnick, Assistant Attorney General and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

I. *INTRODUCTION*

United Parcel Service Company, an air carrier, used 17,611,870 gallons of jet fuel on

domestic flights departing Anchorage but filed Alaska tax returns reporting only 2,159,721 gallons as taxable—the fuel that its flights consumed in Alaska. The state assessed taxes for the total fuel used. Appealing this assessment, UPS insists that Alaska's Motor Fuel Tax Act[1] taxes only "fuel consumed." Since "consumed" ordinarily means "burned," UPS argues that it owes taxes only for fuel actually burned in Alaska. We affirm, holding that although the act taxes jet fuel "consumed," it measures consumption at the pump, not in the plane.

## II. FACTS AND PROCEEDINGS

This case arises on stipulated facts. United Parcel Service does business in Alaska as a direct air carrier. From December 1, 1991, through March 31, 1993, UPS operated flights from Anchorage to both foreign and domestic destinations. The company bought 34,227,324 gallons of jet fuel in Anchorage during this period, storing it in bulk tanks until it was needed for use in departing UPS aircraft. UPS burned 17,611,870 gallons of this fuel in domestic flights and 16,615,454 gallons in international flights.

Under Alaska's Motor Fuel Tax Act, jet fuel sold in Alaska is ordinarily taxed upon transfer.[2] But the act exempts jet fuel sold for use on direct foreign flights.[3] Because UPS bought fuel in bulk for both foreign and domestic flights, the company paid no tax at the time of purchase. It eventually reported as taxable 2,159,721 gallons of fuel, a figure representing the estimated amount of fuel actually consumed by UPS domestic flights in airspace over Alaska.

In June 1993 the Alaska Department of Revenue, Income and Excise Audit Division, audited UPS and assessed additional taxes totaling $385,250.36, plus interest of $39,-788.19. The assessment was for the 15,452,-149 gallons of fuel that UPS loaded into its domestic flights but did not count as being consumed in Alaska. UPS appealed this assessment. Following a hearing, the department affirmed the division's assessment, concluding that UPS was subject to tax as a purchaser under AS 43.40.010(a) for all of the fuel that it purchased for use on its domestic flights. UPS appealed to the superior court, which affirmed the department's assessment, ruling that UPS was subject to the added tax both as a purchaser under AS 43.40.010(a) and as a user under AS 43.40.010(b).

UPS appeals, claiming that it is not subject to the added tax as either a purchaser or user.

## III. DISCUSSION

### A. Standard of Review

■ We do not defer to a decision of the superior court acting as an intermediate court of appeal.[4] Instead, we independently and directly review the merits of the underlying administrative determination.[5] When a case concerns "statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge and experience," we substitute our judgment for that of the agency,[6] "adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy."[7] But we review deferentially an agency's interpretation of its own regulations.[8]

### B. UPS Is Liable for Taxes on All of the Fuel It Loaded into Aircraft Departing Anchorage for Domestic Destinations.

#### 1. Applicable law and the department's decision

Alaska's Motor Fuel Tax Act taxes "all

1. AS 43.40.010—43.40.100.

2. See AS 43.40.010(a); AS 43.40.015.

3. See AS 43.40.100(2)(B).

4. See Handley v. State, Dep't of Revenue, 838 P.2d 1231, 1233 (Alaska 1992).

5. See id.; see also Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co., 746 P.2d 896, 903 (Alaska 1987).

6. Kelly v. Zamarello, 486 P.2d 906, 916 (Alaska 1971).

7. Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

8. See State, Bd. of Marine Pilots v. Renwick, 936 P.2d 526, 530 (Alaska 1997).

motor fuel sold"[9] and "all motor fuel consumed by a user."[10] The version of the act in force during the period at issue here taxed the sale or use of jet fuel at two and one-half cents a gallon[11] but exempted jet fuel sold for use in flights to foreign countries.[12] The act ordinarily required dealers to collect all sales tax at the time of transfer and required users to remit use taxes on a monthly basis.[13] But dealers were not responsible for collecting tax for sales to buyers who certified that the fuel was not intended for a taxable use.[14] The act distinguished a taxable sale from a taxable use by defining "user" to include any "person consuming or using motor fuel, who . . . purchases or receives fuel in the state

that is not taxed at the time of purchase or receipt."[15] Thus, a buyer who avoided taxation by certifying that fuel was not intended for a taxable use but later consumed it for a taxable use became subject to tax as a user.

This tax scheme created a complication for air carriers like UPS, who bought bulk jet fuel intended for use in both foreign and domestic flights—that is, fuel intended for both exempt and non-exempt uses. Because these companies could not predict the exact portion of the bulk fuel that they eventually would use on exempt foreign flights, the state insisted that fuel dealers collect tax on the entire bulk sale, requiring buyers to apply for refunds later, based on actual use of

9. Former AS 43.40.010(a) (1982). At all relevant times, subsection .010(a) provided:
    (a) There is levied a tax of eight cents a gallon on all motor fuel sold or otherwise transferred within the state, except that
    (1) the tax on aviation gasoline is four cents a gallon,
    (2) the tax on motor fuel used in and on watercraft of all descriptions is five cents a gallon,
    (3) the tax on all aviation fuel other than gasoline is two and one-half cents a gallon.

10. Former AS 43.40.010(b) (1982). At all relevant times, subsection .010(b) provided:
    (b) There is levied a tax of eight cents a gallon on all motor fuel consumed by a user, except that
    (1) the tax on aviation gasoline consumed is four cents a gallon;
    (2) the tax on motor fuel used in and on watercraft of all descriptions is five cents a gallon;
    (3) the tax on all aviation fuel other than gasoline is two and one-half cents a gallon.

11. Under the version of AS 43.40.010(a)(3) and (b)(3) in effect in 1991–1993, jet fuel fell into the category of "aviation fuel other than gasoline." See supra notes 9, 10.

12. Former AS 43.40.100(2)(B) (1982) provided that " 'motor fuel' does not include . . . fuel sold for use in jet propulsion aircraft operating in flights to foreign countries."

13. AS 43.40.010(c) provides:
    Every dealer who sells or otherwise transfers motor fuel in the state shall collect the tax at the time of sale, and remit the total tax collected during each calendar month of each year to the department by the last day of each succeeding month. Every user shall likewise remit the tax accrued on motor fuel actually used by the user during each month. If the monthly tax return is timely filed, one percent of the

total monthly tax due, limited to a maximum of $100, may be deducted and retained to cover the expense of accounting and filing the monthly tax return. At the time the remittance is made, each dealer or user shall submit a statement to the department showing all fuel which the dealer or user has distributed or used during the month.

14. AS 43.40.015 provides:
    (a) A dealer who has a reasonable belief at the time of sale or transfer that fuel that is sold or transferred is not to be used as motor fuel need not collect the motor fuel tax. . . .
    (b) . . . [I]f the motor fuel tax is not collected, the dealer shall obtain a certificate of use from the buyer or transferee at the time of the first sale or transfer of the fuel stating that the fuel that has been or will be purchased or received is not intended for use as motor fuel. . . .

15. AS 43.40.100(4)(C). AS 43.40.100(4) provides:
    (4) "user" means a person consuming or using motor fuel, who either
    (A) purchases the fuel out of the state and ships it into the state for personal use in the state;
    (B) manufactures the fuel in the state; or
    (C) purchases or receives fuel in the state that is not taxed at the time of purchase or receipt or is taxed at a rate that is less than the rate prescribed by AS 43.40.010.
This definition is mirrored in 15 Alaska Administrative Code (AAC) 40.900(6) (1999), which provides:
    "user" means a person consuming or using motor fuel who purchases the fuel out of state or ships it into the state for personal use in the state, who manufactures the fuel in the state, or who purchases or receives in the state fuel that is not taxed at the time of purchase or receipt or is taxed at a rate that is less than the rate prescribed by AS 43.40.010[.]

the fuel in exempt flights to foreign countries.

The Department of Revenue addressed this situation in 1984 by revising its regulations. Responding to complaints that the refund process caused air carriers cash flow problems and was "a waste of administrative resources by both the airlines and the Department of Revenue," the department promulgated 15 AAC 40.020(b). For most bulk sales of fuel, subsection .020(b) preserved the existing system of full taxation upon sale subject to later refund based on actual exempt use. But the regulation made an exception for mixed-purpose bulk sales of jet fuel to air carriers who had direct foreign flights, expressly exempting these transactions at the time of the sale:

> Bulk sales of fuel to a person who uses a common storage tank servicing both taxable and nontaxable uses, except bulk sales of jet fuel to a person who flies directly from the state to a foreign country, are subject to the motor fuel tax under AS 43.40.010—AS 43.40.100, but the portion actually used for nontaxable purposes is eligible for a tax refund upon application to the department. A dealer who makes bulk sales of motor fuel shall collect and remit the tax in accordance with this chapter, except that if the sale is a sale of jet fuel to a person who flies directly from the state to a foreign country the tax may not be collected.[16]

In challenging the department's tax assessment, UPS invoked this regulation to support its claim that the company only owed taxes for the jet fuel that it actually burned on domestic flights in Alaska air space. Pointing out that the Motor Fuel Tax Act defines a motor fuel "user" to include any person who buys fuel "that is not taxed at the time of purchase,"[17] UPS reasoned that 15 AAC 40.020(b) made UPS a "user" because it prohibited collection of tax at the time of UPS's bulk purchases of jet fuel. Thus, according to UPS, the company was liable for tax as a user under the act's use tax provision,[18] rather than as a buyer under the act's sales tax provision.[19] Emphasizing that the use tax provision levies tax on motor fuel *consumed* by a user,"[20] UPS insisted that it should only have to pay for jet fuel that its aircraft actually burned in Alaska.

Senior Revenue Hearing Examiner Diane Colvin rejected UPS's position and affirmed the department's assessment, observing that

> [UPS] apparently believes in magic. It is not transformed from a purchaser to a user through the wizardry of an exception created by regulation for purchasers of certain bulk fuels. 15 AAC 40.020(b) addresses collection and refund of the motor fuel tax for certain nontaxable purchases. It does not grant an exemption from the incidence of the tax.

After reviewing relevant legislative history and the circumstances surrounding the department's promulgation and enforcement of 15 AAC 40.020(b), the hearing officer found it "apparent that the legislature did not intend to exempt bulk aviation fuel sold for use in domestic flights," and that "[i]t was obviously the intent of the legislature that fuel purchased for use in domestic flights be taxed." The hearing officer concluded that "15 AAC 40.020(b) relieves purchasers from the need to seek tax refunds, and dealers from the collection requirement, in bulk sales of aviation jet fuel, but it does not exempt purchasers from the tax levied on purchasers by AS

16. 15 AAC 40.020(b). Subsection (b) of 15 AAC 40.020 goes on to provide:

> However, if a portion of that jet fuel is used on a foreign flight that makes more than one stop in this state or makes a stop in another state, the user shall file a return as required by 15 AAC 40.010 and remit the amount of tax due for the jet fuel actually consumed over Alaska. Since the parties have stipulated that all of UPS's international flights during the relevant period traveled directly from Anchorage to foreign destinations and made no intermediate stops in the United States, this provision has no direct bear-

ing here, and we express no opinion concerning its meaning.

17. AS 43.40.100(4)(C) and 15 AAC 40.900(6) (both quoted *supra* note 15).

18. *See* former AS 43.40.010(b) (1982) (quoted *supra* note 10).

19. *See* former AS 43.40.010(a) (quoted *supra* note 9).

20. Former AS 43.40.010(b) (quoted *supra* note 10).

43.40.010(a)." She therefore ruled that UPS was liable for sales tax on all of the jet fuel it purchased for use in its domestic flights. The department adopted this ruling.

2. *Regardless of whether UPS is taxed as a purchaser or as a user, it is liable for tax on all jet fuel used in its domestic flights.*

■ On appeal, UPS again contends that it must be taxed as a user under AS 43.40.010(b) and that, as a user, it should pay only for the actual fuel "consumed" by its domestic flights within Alaska. We find partial merit in these contentions. Subsection .020(b) barred the state from collecting tax from UPS at the time of the company's bulk purchases, expressly providing that "if the sale is a sale of jet fuel to a person who flies directly from the state to a foreign country the tax may not be collected." Because UPS was exempt from paying tax upon purchase, it necessarily became subject to taxation as a user, since the act and the department's regulations alike define "user" to include any person who purchases motor fuel in the state "that is not taxed at the time of purchase." [21]

■ We nonetheless agree in substance with the department's decision that this regulation "does not grant an exemption from the incidence of the tax" imposed as a result of UPS's bulk purchase. As the hearing officer's decision correctly points out, the circumstances surrounding the department's adoption of subsection .020(b) provide compelling evidence that "both the airlines and the Division viewed deferral [of the sales tax imposed under AS 43.40.010(a)] as a means of solving the problems caused by the requirement imposed on airlines to pay the entire tax due and then seek refunds for their bulk purchases of exempt motor fuel." The hearing officer thus justifiably found that, in promulgating subsection .020(b), the department merely intended to "relieve[ ] purchasers from the need to seek tax refunds, and dealers from the collection requirement"—that it did not mean to "exempt purchasers from the tax levied on purchasers by AS 43.40.010(a)." And as the hearing officer also observed, the department has always enforced this regulation in accordance with this intended meaning. The department's interpretation of its own regulations deserves considerable deference. [22]

■ UPS nevertheless maintains that it is not claiming an exemption under subsection .020(b); it insists that the only claim it raises is one involving statutory interpretation: "What is at issue ... is whether the statute *imposes* tax on [UPS] in the first place, not whether [UPS] can claim an *exemption.*" UPS contends that, in the absence of a taxable sale under AS 43.40.010(a), it became subject to tax as a user under AS 43.40.010(b). Since AS 43.40.010(b) taxes only fuel "consumed by a user," UPS argues that, as a user of the jet fuel loaded into its aircraft, it was liable for tax only to the extent that its fuel was "consumed" in Alaska. And because "consumed" commonly means "burned," UPS contends that fuel loaded into its aircraft but not actually burned over Alaska was not "consumed" in Alaska. [23]

---

21. AS 43.40.100(4)(C); 15 AAC 40.900(6) (both quoted *supra* note 15).

22. *See State, Bd. of Marine Pilots v. Renwick,* 936 P.2d 526, 530 (Alaska 1997). As the state correctly notes, moreover, it would be legally problematic to construe 15 AAC 40.020(b) to subject UPS to a lower tax obligation as a user than it would have paid as a purchaser. *See Vail v. Coffman Eng'rs, Inc.,* 778 P.2d 211, 214 (Alaska 1989) (a regulation must be consistent with the statute that it interprets or implements).

23. UPS additionally contends that the state should be foreclosed from claiming that the company was not subject to taxation as a purchaser, since the superior court ruled against the state on that point and the state failed to file a cross-appeal. Although our decision upholding the department's assessment as a use tax rather than as a sales tax renders this issue academic, we note that a prevailing party may generally argue for affirmance on appeal on any legal theory. *See Sea Lion Corp. v. Air Logistics of Alaska, Inc.,* 787 P.2d 109, 116 (Alaska 1990). UPS's reliance on *Andersen v. Edwards,* 625 P.2d 282, 285 (Alaska 1981), as authority for the proposition that a cross-appeal was necessary here is unavailing, since that case stands for the narrow proposition that a cross-appeal is necessary to preserve a point upon which the trial court has formally entered a directed verdict against the prevailing party. We further note, in any event, that in an administrative appeal from the superior court, we do not review the superior court's decision;

UPS essentially maintains that the plain meaning of the use tax statute must prevail over the intended meaning of the department's regulation—15 AAC 40.020(b). But UPS's attempt to trump the regulation with plain statutory meaning is unconvincing for three reasons. First, UPS overlooks that the regulation explains why the company must now be taxed as a user. Both the plain meaning of the act and the history of its enforcement by the department establish that, before the department adopted subsection .020(b), bulk sales of jet fuel for storage in tanks serving taxable and nontaxable uses were taxable sales under AS 43.40.010(a). Hence, UPS must rely on the regulation's exemption from the sales tax in order to claim its current status as a "user"—without it, the company would have been required to pay tax upon purchase.

Second, UPS's insistence on interpreting the use tax based on the plain meanings of "consumed by a user" and "consumed" ignores the legislative history of the definition of "user." As earlier indicated, AS 43.40.100(4)(C) defines "user" to include "a person consuming or using motor fuel who . . . purchases or receives fuel in the state that is not taxed at the time of purchase or receipt." The legislature enacted this definition in 1982.[24] The legislative history of the provision establishes that it was enacted to plug a loophole that had prevented the state from collecting taxes from persons who originally bought fuel tax-free because they intended to use it for an exempt purpose, but who later used it for a taxable purpose.[25] The underlying purpose of the definition thus strongly suggests a legislative intent to subject purchasers and users to equivalent motor fuel taxes.

Last, neither the plain meaning of "consumed" nor the act's use of that word in the phrase "consumed by a user" conflicts with the department's interpretation of 15 AAC 40.020(b) or suggests a legislative intent to subject a "user" like UPS to taxation under a qualitatively different standard than a buyer. UPS's insistence on equating the common meaning of "consume" with "burn" confuses the nature of the activity taxed by the act's user provision—the activity of "consuming" or, as UPS would have it, "burning"—with the manner in which the act measures that activity for purposes of imposing tax liability.

While it is certainly reasonable to assume that the legislature intended to adopt the plain meaning of "consume" in the statutory phrase "consumed by users," this assumption hardly establishes the legislature's intent to fix tax liability for users at the exact time of consumption. Neither law nor logic would support the conclusion that the precise moment of jet fuel combustion is the only permissible moment for triggering tax liability based on consumption. Rather, in choosing how to tax users for consuming motor fuel, the legislature could base tax liability on any convenient measure of consumption that it deemed reasonably related to actual consumption. Since fuel consumption is commonly and conveniently measured at the pump,[26] we find no reason to presume that the legislature intended to adopt a less common and less sensible measure—moment of actual combustion.

That measuring actual jet fuel burned in Alaska airspace would be impractical cannot seriously be doubted. As the hearing officer aptly noted, "the legislature provided no discrete formula for taxing fuel used in domestic flights. [UPS] was forced to create its own, concluding that only the fuel burned over Alaska is taxed." And UPS calculated its instate consumption from estimates rather than actual measurement.

---

rather we directly review the decision of the agency. *See Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992); *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987).

24. *See* ch. 82, § 11, SLA 1982.

25. *See* March 9, 1982, Memorandum from Robert Kessel to R.D. Stevenson, Department of Revenue, regarding C.S.H.B. 37/C.S.H.B. 101 (Rules); *see also* Sectional Analysis C.S.H.B. 101, § 13.

26. *See, e.g., United Air Lines, Inc. v. Mahin,* 410 U.S. 623, 626, 93 S.Ct. 1186, 35 L.Ed.2d 545 (1973) (referring to an Illinois tax creating a taxable use "when the fuel is taken out of storage facilities and is placed into the tank of the airplane").

Moreover, the provisions of the act that relate to consumption by users provide no textual support for UPS's self-serving conclusion that "only the fuel burned in Alaska is taxed." While the act's definition of "user" requires purchase or receipt of fuel "in the state," it imposes no like requirement on consumption, stating only that " 'user' means a person consuming or using" such locally purchased fuel.[27] In addition, the act repeatedly refers to "use" and "consumption" interchangeably. For example, the definition of "user" contains both words, speaking of "a person consuming or using;"[28] the definition of "motor fuel" excludes "fuel sold for use" in flights to foreign countries (not fuel sold for "consumption" or "combustion" in such flights);[29] and elsewhere the act holds dealers responsible for failing to collect tax on fuel sold for a nontaxable use if the department subsequently learns that the fuel "was put to a use" that was taxable (not that the fuel "was consumed" for such a use).[30]

In fact, even the act's provision establishing the motor fuel use tax speaks loosely of both "use" and "consumption":

(b) There is levied a tax of eight cents a gallon on all motor fuel *consumed* by a user, except that

(1) the tax on aviation gasoline *consumed* is four cents a gallon;

(2) the tax on motor fuel *used* in and on watercraft of all descriptions is five cents a gallon;

(3) the tax on all aviation fuel other than gasoline *is* two and one-half cents a gallon.[31]

As can readily be seen, this language seems to ascribe no particular significance to the precise words that it employs to describe

the use tax. It imposes the use-tax rates of eight and four cents a gallon for "consumption"; it applies the five-cent per gallon rate for "use"; and, without specifying any particular form of use, it simply says that the two-and-one-half-cent tax "is" imposed.

The act's indiscriminate reliance on "use" and "consumption" thus belies any legislative intent to seize upon actual combustion of jet fuel within Alaska's borders as a measure of actual use. In contrast, both the legislative history of the act's definition of "user" and the administrative history of the regulation exempting mixed-purpose bulk sales of jet fuel provide strong support for the conclusion that, as applied to jet fuel, the act's use and sales taxes are meant to be coextensive. This, in turn, suggests a legislative intent to measure "consumption" by a standard that takes into account the entire portion of fuel in an untaxed bulk sale that is eventually applied to the originally intended taxable use—in other words, all of the bulk sale jet fuel that is eventually loaded into a domestic flight.

However, UPS warns that taxing out-of-state consumption would be impermissible. It invokes "a fundamental constitutional rule . . . that a state tax can apply only to . . . a transaction, or to some other event that is located or takes place in the taxing state."[32] But this rule poses no obstacle to taxation here, since the act measures consumption at the pump—a transaction that takes place within Alaska—and since UPS expressly stipulated that it has paid no taxes on the disputed fuel to any other state. We thus find no danger of an unconstitutional result.[33]

## IV. CONCLUSION

For these reasons, we conclude that under 15 AAC 40.020(b) and AS 43.40.010(b) UPS

27. AS 43.40.100(4)(C) (quoted *supra* note 15).

28. *Id.*

29. AS 43.40.100(2)(B).

30. AS 43.40.015(a).

31. Former AS 43.40.010(b) (1982) (emphasis added).

32. In support of this rule, UPS cites *Oklahoma Tax Commission v. Jefferson Lines, Inc.,* 514 U.S. 175, 183, 115 S.Ct. 1331, 131 L.Ed.2d 261

(1995). The state contests UPS's reading of the case and vigorously argues that it would be inapplicable here. Given our conclusion that UPS stands in no danger of double-taxation, we need not resolve this dispute.

33. *Cf. Kenai Peninsula Borough v. Arndt,* 958 P.2d 1101, 1105–06 (Alaska 1998) (apportionment of property tax unnecessary to avoid unconstitutional taking where property owner fails to allege or show circumstances indicating any actual danger of multiple taxation).

was subject to tax as a user to the same extent that it would have been subject to tax as a purchaser under AS 43.40.010(a) had 15 AAC 40.020(b) not barred collection of a sales tax. Our conclusion accords with the substance of the department's decision, if not with its precise legal theory. We therefore AFFIRM the assessment of taxes for all jet fuel that UPS loaded into the tanks of its aircraft making domestic flights from Anchorage.